## Case No. 7,290.

### The JEREMIAH.

[10 Ben. 338.] [1]

District Court, S. D. New York. March, 1879.

W. R. Beebe, for salvors and material men.
D. McMahon, for owners of schooner.

CHOATE, District Judge. The first of these cases is a libel brought by the owners of the steam-tug H. W. Edye, to recover the sum of a thousand dollars for alleged salvage services rendered to the brig Jeremiah, in pulling her apart from the schooner P. A. Sanders, with which vessel she was in collision [see Case No. 7,289], and afterwards in towing her into the port of New York in a crippled condition. The other cases are libels and petitions of parties having mari-

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

time liens for supplies, towage and other services against the brig, which was a foreign vessel.

On the morning of the 16th of March, 1876, the brig came into collision with the schooner above named, about six miles off the Jersey coast, a little to the north of Barnegat light. The collision took place about three o'clock in the morning, and the brig was unable to disengage herself from the schooner. The tug H. W. Edye was cruising about, looking for business, and seeing the vessels in collision, came up and offered assistance. An agreement was first made between the master of the tug and the master of the brig to pull the brig free for a hundred dollars. This was done. An attempt was then made by the tug to tow the schooner, the intention then being to tow the vessels both in together. But this intention was abandoned, as the schooner was found very difficult to tow, being full of water, but kept afloat by her cargo of wood. The master of the tug then negotiated with the master of the brig as to the terms on which he would tow the brig back to New York, from which port she had sailed on a voyage to Cardenas. After several offers made by the master of the brig had been refused, the master of the tug finally agreed to tow her in for a thousand dollars, including the hundred dollars already agreed to be paid for pulling the vessels apart. Accordingly the tug towed her in and brought her to a pier in this harbor in ten or eleven hours after getting under way. The brig has been sold under a decree of this court to pay seamen's wages, and the surplus, about three thousand five hundred dollars, has been paid into the registry. The owners of the schooner, who claimed damages against the brig exceeding her value, by reason of the collision, which was caused, as they say, by the fault of the brig, appear and defend this libel, on the ground that the amount claimed as salvage is greatly excessive, and they also claim that their own damages on account of the collision are entitled to a preference.

As to the claim of the respondents that the damages on account of the collision are entitled to preference, it is clearly unfounded. It is true that the claim had attached before the service of the tug was rendered, but surely those who have acquired a claim in rem against a vessel for a collision stand in no better position towards subsequent salvors than they would have stood if the law, instead of giving them a lien against the vessel, had by mere operation of law invested them with the absolute title to her. Clearly, in that case, as owners, their interest would be subject to the right and claim of the salvors. The interest of these respondents has been rescued from danger and risk of loss by the salvors, as truly as if their interest were a title to the vessel instead of being merely a lien upon it.

As to the claim for salvage, the facts were that the two colliding vessels had been together half an hour, and so far had been unable to separate themselves. They were about thirty-eight miles from Sandy Hook. The weather was bad, wind E. N. E. and blowing hard, with signs of its rising. The brig, when pulled away from the schooner, was so far crippled in her sails, spars and rigging, that it was doubtful if she could get back to port without help. She was wholly disabled from prosecuting her voyage. She was within about five miles then of the Jersey shore, which was of course a lee shore. Her starboard bow port, which was within three feet of the water line, was knocked out, and every time she went down into the sea she shipped considerable water, but she did not leak otherwise and her pumps were in good order. An attempt of the crew to close up this hole had been unsuccessful. There was no other tug or vessel in sight at the time the agreement for towage was made. It is claimed by the libellants that the brig was in great danger of filling and going down on account of this injury to her bow, and that she would also have probably been unable to keep off the shore, towards which the wind and the currents were then setting her; that these dangers were increased by the symptoms of heavier easterly weather then observed. From these causes the brig was undoubtedly in some danger, but, I think, upon the testimony, her position was far from being so critical as the libellants claim. Her value, when she sailed on that voyage, had been about eight thousand dollars. After receiving repairs of trifling amount she sailed again for Cuba, and on her return was seized on a libel for seamen's wages and sold under a decree of this court for $4,025. She had no cargo at the time of the collision. The tug was in the course of her usual employment; she encountered no risk or danger in the service rendered, unless indeed it was the risk of not being able to bring the vessel in at all, which, under the circumstances, cannot be considered a risk of any appreciable amount. The usual charge for towage by such a tug, in and about the harbor of New York, is shown to have been ten dollars an hour, and for towing vessels in from the sea there appears to be no settled rate. The master of the brig testified that they always got all they could. It is the duty of the court to moderate, according to the principles of fairness and justice, contracts thus made with parties in distress, if they appear to be extortionate. On all the evidence, I think five hundred dollars a full and fair compensation for the entire service rendered to the brig, giving full force to all the evidence of the peril from which she was rescued and her value, and that the agreement to pay a thousand dollars was extorted from the master of the brig under stress of his necessities.

The claims of the various other libellants

and petitioners are for services and supplies rendered and furnished to the brig on her credit after she was brought back to New York, where she was repaired, and from whence she sailed on another voyage before she was libelled for the collision or for salvage. The attempt to show that there is another fund, the freight, out of which they may be satisfied, was not successful. The surplus in the registry must be applied to the payment of these liens, amounting to about $392, the salvage $500, and the balance will go to satisfy the decree in favor of the owners of the schooner P. A. Sanders. As all these libellants and petitioners appeared by the same counsel and proctors, but one bill of costs will be taxed. Decree accordingly.